USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ___
DATE FILED: 3/30/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------X

W.S. and K.M., individually and Collectively and on behalf of T.S.,

Plaintiffs,

-against-

NYACK UNION FREE SCHOOL DISTRICT,

Defendant

--------------------------------X

09 Civ. 10139 (DAB)
MEMORANDUM & ORDER

DEBORAH A. BATTS, United States District Judge.

Plaintiffs W.S. and K.M., on behalf of T.S., filed this action against Nyack Union Free School District ("the District") on December 11, 2009, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq., and Article 89 of the New York State Education Law, seeking reversal of an administrative decision of the State Review Officer ("SRO"), which denied private school tuition reimbursement for T.S. Both parties now move for summary judgment. For the reasons stated herein, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.

# I. BACKGROUND

## A. IDEA

The Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., allots federal funds for states that offer a "free and appropriate public education" ("FAPE") to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). The state must establish for each child an Individualized Educational Program ("IEP") that is "reasonably calculated to enable the child to receive educational benefits." Gagliardo v. Arlington Central School Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)). If the school district fails to supply a FAPE, the child's parent may seek tuition reimbursement for the child's placement in a private school. 20 U.S.C. § 1412(a)(10)(C)(ii).

New York receives federal funds under this statute, and charges Committees on Special Education ("CSE"s) with the responsibility of formulating the IEPs. The CSEs are established by local boards of education. N.Y. Educ. L. § 4402(1)(b)(1); 8 N.Y.C.R.R. 200.3(a). Each CSE is comprised of, among other people, the child's parent or guardian, the child's regular education teacher, the child's special education teacher, and a school psychologist. 8 N.Y.C.R.R. 200.3(a)(1). The CSE's membership also shall include "an additional parent member of a

student with a disability residing in the school district or a neighboring school district, provided such parent is not a required member if the parents of the student request that the additional parent member not participate in the meeting...." 8 N.Y.C.R.R. 200.3(a)(1)(viii).

"New York parents who believe an IEP is insufficient under the IDEA may challenge it in an 'impartial due process hearing,' see 20 U.S.C. § 1415(f), before an [Impartial Hearing Officer ("IHO")] appointed by the local board of education, see N.Y. Educ. L. § 4404(1)." Bd. of Educ. v. Mills, No. 03 Civ. 50, 2005 WL 1618765 at *1 (S.D.N.Y. Jul. 11, 2005), quoting Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003). "At this hearing and throughout the subsequent administrative and judicial appeals process, the school district bears the burden of proving by a preponderance of the evidence that: (1) it complied with the IDEA procedural requirements; and that (2) the IEP was 'reasonably calculated' to confer 'educational benefits' on the students." J.R. v. Bd. of Educ of the City of Rye Sch. Dist., 345 F.Supp.2d 386, 394 (S.D.N.Y. 2004) (quoting Rowley, 458 U.S. at 206-07). "The Impartial Hearing Officer's decision may be appealed to a [State Review Officer, ("SRO")], see N.Y. Educ. L. § 4404(2); 20 U.S.C. § 1415(g), whose decision may be challenged in either state or federal court." Mills, 2005 WL 1618765 at *1 (citing 20 U.S.C. § 1415(i)(2)(A)).

B. Factual Background

Except where noted, the following facts are undisputed.

T.S., the daughter of K.M. and W.S. is a minor child who was classified by the District's CSE with an "Other Health Impairment". (Pls.' 56.1 Stmt., ¶ 1.) Plaintiffs claim that T.S. was born in Hadiya, Ethiopia, but that the date and year of her birth are unknown. (Id., ¶ 2.) Defendant notes that W.S. and K.M. supplied the school district with a birth certificate listing T.S.'s place of birth as Addis Ababa, Ethiopia, and her date of birth as January 15, 2001. (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 2.) T.S.'s biological father died early in life, and her biological mother is believed to have died in December of 2005. (Pls.' 56.1 Stmt., ¶ 3.) At the end of 2005, neighbors discovered T.S. and her sister next to the body of their mother. (Id., ¶ 4.) A police report characterized the children as dehydrated and malnourished. (Id.)

T.S. was sent to an orphanage in Addis Ababa with 150 children, and subsequently transferred to a foster home with 55 children who were eligible for international adoption. (Id., ¶ 5.) While in the orphanage, T.S. was punished by being hit with a walking stick. (Id., ¶ 6.) She was confused as to whether her mother had died, and police were called on at least one occasion due to T.S.'s screaming. (Id.)

T.S.'s adoption was finalized in March of 2006, and she arrived in the United States with her sister on April 15, 2006. (Pls.' 56.1 Stmt., ¶ 7.) When T.S. arrived in the United States, she had congenital heart defects, G.I. parasites, and skin disturbances due to low immunity and a history of malnutrition. (Id., ¶ 8.) K.M. and W.S. had been advised that T.S. was three or four years old, but by July of 2006, T.S. had gained eighteen pounds, grown five inches, and appeared to be five or six years old. (Id., ¶¶ 9-10.) T.S. displayed severe behavioral problems with her adoptive family. (Id., ¶ 11.) She would hit, throw dishes and awake in the night screaming. (Id.) She followed K.M. from room to room and was highly anxious. (Id.) She exhibited inappropriate sexual behaviors, suggesting that she may have been sexually abused prior to her adoption. (Id.)

In September of 2006, T.S. was enrolled in Beginning with Children Charter School for Kindergarten. (Pls.' 56.1 Stmt., ¶ 12.) Plaintiffs claim that she received English as a Second Language ("ESL") services and was seen by a reading specialist twice per week. (Id.) Defendants state that her fall report card from Beginning with Children Charter School did not indicate that T.S. received any type of support or special education services. (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 12.) On or about February 1, 2007, T.S. was enrolled in Upper Nyack

Elementary School ("Upper Nyack"), following her parents' decision to relocate to Nyack, New York. (Id., ¶ 13.) Plaintiffs claim that at Upper Nyack, T.S. was enrolled in a Collaborative Team Teaching ("CTT") class with both regular and special education students. (Pls.' 56.1 Stmt., ¶ 13.) Plaintiffs claim that in September of 2007, K.M. met with T.S.'s first grade teacher, Frank Pregiato, to discuss T.S.'s history and indeterminate age. (Id., ¶ 14.) Mr. Pregiato testified that he did not recall such a meeting taking place. (Tr.,[1] 226-27.)

K.M. claims that she disclosed to Mr. Pregiato that T.S. was frustrated and crying after school, that she was unable to do the homework she was given, and that she had difficulty remembering concepts discussed in class and friends' names. (Pls.' 56.1 Stmt., ¶ 15.) Although Mr. Pregiato testified that T.S. was very well-behaved and never disruptive in class (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 15), he also testified that T.S. sometimes cried in class when she made mistakes (Tr., 258), and was anxious and frustrated at times (Tr., 262-63). Mr. Pregiato testified that K.M. told him T.S. had trouble at home with homework. (Tr., 272.) Furthermore, Mr. Pregiato testified that T.S. tended to rush through her work, leading to simple mistakes

[1] References to "Tr." refer to the transcript of the hearing before the Impartial Hearing Officer ("IHO"), held on four days between April 1 and 23, 2009.

(Tr., 250), and that T.S. had trouble communicating with her best friend (Tr., 242).

T.S. received articulation therapy during first grade from a speech therapist, Ms. Maddalena. (Pls.' 56. Stmt., ¶ 17.) Ms. Maddalena testified that T.S. did not carry over her teachings into Mr. Pregiato's classroom or in her everyday speech, but also that this was "not atypical of a child in first grade." (Id., ¶ 18; Def.'s Resp. Pls.' 56.1 Stmt., ¶ 18; Tr., 151.)

After T.S. scored poorly on a Primary Literacy Assessment ("PLA") in October of 2007, she began receiving additional reading services. (Pls.' 56.1 Stmt., ¶ 20; Def.'s Resp. Pls.' 56.1 Stmt., ¶ 19.) Although T.S.'s parents requested an Instructional Support Team ("IST") meeting in October of 2007, Mr. Pregiato advised them that such a meeting would be premature, and that they should let T.S. continue with the additional reading services for eight to ten weeks to see if her skills improved. (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 24.) K.M. testified that she approached the school psychologist, Dr. Engelberg, in October of 2007 about setting up a CSE meeting for T.S., but was told that an IST meeting needed to occur first, and that no such meeting was necessary. (Pls.' 56.1 Stmt., ¶¶ 24-26.) Defendant denies that K.M. ever approached Dr. Engelberg, and claims that the parents agreed with Mr.

Pregiato's recommendation to wait to schedule an IST meeting to see if T.S.'s reading skills improved. (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 25.)

K.M. testified that she met with Mr. Pregiato more than nine times over the course of the 2007-2008 school year. (Pls.' 56.1 Stmt., ¶ 33.) Mr. Pregiato testified that, at the request of the parents, he created a "behavior academic plan" to address T.S.'s social difficulties and tendency to rush through assignments. (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 30.)

The parents obtained a private psychiatric evaluation of T.S. from Dr. Laura Whitman, which was conducted between January and May of 2008. (Pls.' 56.1 Stmt., ¶ 34.) Dr. Whitman diagnosed T.S. with Attention Deficit Hyperactivity Disorder ("ADHD") and Post-Traumatic Stress Disorder ("PTSD"), an Expressive Language Disorder and a Learning Disorder Not Otherwise Specified. (Id., ¶ 35.) Dr. Whitman claimed that ". . . [a]t this time, [T.S.] is unable to progress academically and developmentally at the expected pace, as she needs a setting with more support" and "[T.S.] needs to be in a small class with a low student teacher ratio. She also needs to be in a school with the ability to remediate language-based learning disabilities, and which provides special education for language, reading and writing . . ." (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 36.) T.S. was referred to Dr. Barbara Kenner "to determine

[T.S.'s] current level of cognitive, academic, and emotional functioning, and to facilitate educational planning." (Id., ¶ 37.) Dr. Kenner evaluated T.S. in April of 2008 and claimed that T.S. should be placed in a "structured, nurturing, and highly specialized school for bright students with language-based learning disabilities." (Id., ¶ 38.)

K.M. wrote a letter in approximately May of 2008 requesting a CSE meeting for T.S. (Tr., 532.) The parents applied to the Stephen Gaynor School in May of 2008. (Pls.' 56.1 Stmt., ¶ 57.) The parents signed a contract to enroll T.S. at the Stephen Gaynor School on May 30, 2008, obligating them to pay a non-refundable $7,400.00 registration fee. (Id., ¶ 59; Def.'s Resp. Pls.' 56.1 Stmt., ¶ 57.)

The District scheduled a CSE meeting for June 26, 2008, but that meeting was rescheduled at the request of the parents. (Def.'s 56.1 Stmt., ¶ 18; Dist. Ex. 16.) A CSE meeting for T.S. was held on July 21, 2008. (Pls.' 56.1 Stmt., ¶ 40.) Patricia Seminelli, the Supervisor of Special Education for the Nyack Union Free School District chaired the meeting. (Id., ¶ 41.) Ms. Maddalena was present at the meeting. (Id., ¶ 42.) Mr. Pregiato was not present, but submitted a teacher report to be considered at the meeting. (Id., ¶ 43.) Although New York State law requires that "an additional parent member of a student with a disability residing in the school district or a

neighboring school district" be present at the meeting, 8 N.Y.C.R.R. 200.3(a)(1)(viii), no additional parent member attended. (Pls.' 56.1 Stmt., ¶ 44.)

State law and regulations require a social history, defined as "a report of information gathered and prepared by qualified school district personnel pertaining to the interpersonal, familial, and environmental variables which influence a student's general adaptation to school, including but not limited to data on family composition, family history, developmental history of the student, health of the student, family interaction and school adjustment." 8 N.Y.C.R.R. 200.4(b)(1)(iii); 8 N.Y.C.R.R. 200.1(tt). No social history was conducted prior to the meeting. (Pls.' 56.1 Stmt., ¶ 47; Def.'s Resp. Pls.' 56.1 Stmt., ¶ 47.) No Functional Behavioral Assessment ("FBA") was conducted for T.S. prior to the CSE meeting. (Pls.' 56.1 Stmt., ¶ 50.)

Dr. Engelberg, the school psychologist, stated at that meeting that if T.S. were classified as speech and language impaired, it could result in the District being responsible for funding T.S. in a private, specialized school. (Id., ¶ 54; Def.'s Resp. Pls.' 56.1 Stmt., ¶ 54; Tr., 545.) T.S. was classified as having an "Other Health Impairment," and the CSE recommended she be placed in a mainstream second grade class and that she receive related services consisting of speech/language

therapy in a group of not more than three students for three times per week for thirty minutes per session, and psychological consultation one time every two weeks for thirty minutes per session. (Def.'s Resp. Pls.' 56.1 Stmt., ¶ 56.)

On September 17, 2008, Plaintiffs K.M. and W.S. requested a due process hearing, alleging a denial of a FAPE by the District for the 2008-2009 academic year and seeking reimbursement for the unilateral placement of T.S. at the Stephen Gaynor school for the 2008-2009 academic year. (Pls.' 56.1 Stmt., ¶ 67.) At a hearing lasting four days between April 1, 2009 and April 23, 2009, the IHO heard testimony and accepted evidence from both parties. (Id., ¶ 68.) On August 3, 2009, the IHO rendered a decision holding that the District did not provide T.S. a FAPE and awarding the parents tuition reimbursement. (Id., ¶ 69.) The District appealed the IHO's decision to the New York State Education Department's Office of State Review. (Id., ¶ 70.) The SRO's October 5, 2009 decision sustained the appeal and denied the request for tuition reimbursement. (Id., ¶ 71.)

By a Complaint of December 11, 2009, the parents seek review in this Court of the SRO's decision. Both parties' motions for summary judgment are presently before this Court.

# II. Discussion

## A. The Summary Judgment Standard

A district court will grant summary judgment only when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000). Genuine disputes of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). While a court must always "resolv[e] ambiguities and draw [ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson, 477 U.S. at 252), the non-movant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a

motion for summary judgment." Id. at 12. Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).

These same standards apply where, as here, there are cross-motions for summary judgment. Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc., 88 F. Supp. 2d 188, 193 (S.D.N.Y. 2000). A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but "'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Heublein, Inc., 996 F.2d at 1461 (quoting Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 313-14 (2d Cir. 1981))

B. Judicial Review under IDEA

IDEA actions are generally resolved on summary judgment. See, e.g., S.H. and B.P. ex rel. S.H. v. New York City Dep't of Educ., No. 10 Civ. 1041, 2011 WL 666098 (S.D.N.Y. Feb. 15,

2011); Thies v. New York City Bd. Of Educ., No. 07 Civ. 2000, 2008 WL 344728 (S.D.N.Y. Feb. 4, 2008). A federal court reviewing administrative proceedings under IDEA "shall receive the records of the administrative proceedings"; "shall hear additional evidence at the request of a party"; and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

"The Supreme Court and [the Second Circuit] have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 380-81 (2d Cir. 2003), citing Rowley, 458 U.S. at 204-08; Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998). The reviewing federal court "must give 'due weight' to the administrative proceedings, mindful that the judiciary lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Grim, 346 F.3d at 381, quoting Rowley, 458 U.S. at 206-08 (internal quotation marks omitted). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." Walczak v. Florida Union Free School Dist., 142 F.3d 119, 129 (2d Cir. 1998).

C. Tuition Reimbursement under IDEA

Parents who are dissatisfied with a school district's recommendations for their child for a given school year may place their child in a private school unilaterally and then seek retroactive tuition reimbursement from the local school district. 20 U.S.C. § 1412(a)(10)(C). The Supreme Court in School Comm. Of Burlington v. Dep't of Ed., 471 U.S. 359 (1985), set out a three-step test to determine whether to award private school tuition funding under IDEA. Id. at 370. The DOE is required to pay for a program selected by the parent only if: 1) the IEP proposed by the school district was inappropriate; 2) the private placement was appropriate for the child's needs; and 3) the equities support the parent's claim. Id. at 374.

When reviewing an IEP under IDEA, "a district court must make a two-step inquiry: first, the court must consider whether the state has complied with the Act's procedural requirements; second, it must consider whether the IEP is 'reasonably calculated to enable the child to receive educational benefits.'" Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2nd Cir. 1997) (quoting Board of Ed. v. Rowley, 458 U.S. 176, 207-07 (1982)).

1. Procedural Adequacy of the IEP

Procedural compliance with IDEA "is no mere formality," as "adequate compliance with the procedures prescribed would in

most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." Rowley, 458 U.S. at 206. Nevertheless, not all procedural inadequacies render an IEP inadequate under IDEA. See A.C. v. Bd. Of Educ. of Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 (2d Cir. 2005). A procedural violation may lead to the conclusion that a child was denied a FAPE only where the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits. See Grim, 346 F.3d 377 (2d Cir. 2003); see also Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) ("[P]rocedural flaws do not automatically require a finding of a denial of a FAPE. But procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE.").

Plaintiffs point out four procedural inadequacies with the IEP: (1) the District failed to conduct the required social history of T.S. prior to the CSE meeting; (2) the District failed to secure the attendance of an additional parent member; (3) the District failed to secure the attendance of the child's

regular education teacher; and (4) the District failed to conduct a Functional Behavior Assessment ("FBA") for T.S.

The District does not dispute that they failed to conduct a social history of T.S. prior to the CSE meeting. Instead, the District contends that this error did not deny T.S. a FAPE because K.M. verbally gave information about T.S.'s background at the CSE meeting. (Def.'s Mem. L., p. 20.) The IHO found that "[t]aking the history at the time of the meeting is not acceptable under the regulations and it is the parent's testimony that under the circumstances the history was necessarily truncated and incomplete." (IHO Decision, p. 14.) The SRO, however, found that the failure to conduct a social history prior to the CSE meeting did not deprive T.S. of a FAPE because "the student's mother verbally provided in-depth information regarding the student's social history for approximately 45 minutes during the CSE meeting, which lasted between 1 ½ to 2 hours (Tr. pp. 57, 89-90)." The SRO Decision continues, "[a] review of the student's July 21, 2008 IEP reflects that the CSE considered the social history information as provided by the student's mother." (SRO Decision, p. 20.)

As for the additional parent member, the IHO found that K.M. was only told that an additional parent member was unavailable when K.M. arrived at the CSE meeting, where she was told that if she wanted an additional parent member present, the

meeting would have to be rescheduled and may be put off for a significant period of time because of vacations and availability. (IHO Decision, p. 13.) K.M. verbally consented to proceed without the additional parent member, but did not execute a written waiver. (SRO Decision, p. 18.) In the absence of a written waiver, the SRO found that the agreement to go forward was "procedural error and contrary to State law and regulation." (Id.) Nevertheless, the IHO concluded that the absence of an additional parent member "by itself does not rise to the level of depriving the student of FAPE [sic]." (IHO Decision, p. 13.) The SRO agreed, noting that the parents had another child in the District who was classified as eligible for special education services, so they were familiar with the process. (SRO Decision, p. 18.) Furthermore, the SRO found that K.M. participated actively in the CSE meeting by providing a verbal social history and by asking questions. (Id.)

With respect to the absence of the student's general education teacher, which the IHO did not address, the SRO concluded that the CSE was improperly constituted. (SRO Decision, p. 19.) Nevertheless, the SRO concluded that T.S. was not denied a FAPE because Mr. Pregiato submitted a report to the CSE and a third grade general education teacher from T.S.'s school attended the meeting. (SRO Decision, p. 19.)

The IHO did not address the absence of an FBA, but the SRO concluded that "the student did not exhibit behavioral issues indicating that an FBA was required prior to the July 21, 2008 CSE meeting." (SRO Decision, p. 21.) The SRO took note of Mr. Pregiato's testimony that T.S. was "never disruptive" and was "very well behaved," but also noted that Mr. Pregiato had set up a "behavior academic plan" to address T.S.'s difficulties communicating with her best friend and her tendency to rush through her work. (Id.) The CSE recommended in the IEP that an FBA be completed "because of the student's mother's concerns that the student's behavior was affecting her performance in school." (Id., p. 21.)

a. Social History

This Court agrees with the SRO that although the failure to conduct a social history violated State law and regulation, it did not impede T.S.'s right to a FAPE, significantly impede the parents' opportunity to participate in the decisionmaking process, or cause a deprivation of educational benefits. The CSE had information about T.S.'s social history through a verbal report provided by T.S.'s mother at the CSE meeting. (SRO Decision, p. 20; Tr., 57, 89-90.) Ms. Seminelli and Ms. Maddalena both testified that the verbal social history convinced them that T.S. in fact had a disability, which they

would not have concluded in the absence of the verbal history. (Tr., 59, 174-75.)

The IEP indicates that the CSE considered T.S.'s complicated history and her psychiatric diagnoses. (See Dist. Ex. 17.) Furthermore, some of the relevant facts of T.S.'s social history were included in the Notes from Dr. Whitman's Psychiatric Evaluation and the Neuropsychological Assessment, which were relied upon by the CSE in developing T.S.'s IEP. (Dist. Exs. 7, 8, 17; Tr., 47-48.) A written social history was prepared after the CSE meeting. (See Dist. Ex. 18.) Plaintiffs do not point to any facts in the written social history that the CSE failed to consider or that might have had a bearing on its decision. There is no evidence on the record that the failure to conduct a social history prior to the CSE meeting impeded T.S.'s right to a FAPE.

b. Additional Parent Member

There is no dispute that the CSE was improperly constituted due to the absence of an additional parent member, as required by New York State Education Law § 4402(1)(b)(1)(a) and 8 N.Y.C.R.R. 200.3(a)(1)(viii). In concluding that there was insufficient evidence in the hearing record to demonstrate that this irregularity rose to the level of a denial of a FAPE, the SRO found that the parents had some experience with the IEP process because they had another child in the District who was

classified as eligible for special education services, and that "the student's mother actively participated in the CSE meeting by providing a verbal social history, including information from private evaluations into the discussion, and by asking questions and seeking clarification." (SRO Decision, p. 18.)

This Court agrees with the SRO that there is insufficient evidence in the hearing record to conclude that this procedural violation resulted in the denial of a FAPE or impeded the parents' right to participate in the decisionmaking process. Although K.M. did not waive the presence of an additional parent member in writing, there is no dispute that she verbally agreed to proceed in the absence of an additional parent member. (Tr., 538.) The SRO's decision was supported by evidence in the record that K.M. participated actively in the meeting. (SRO Decision, p. 18.) There is no evidence in the record to support Plaintiff's contention that the absence of an additional parent member "result[ed] in insufficient information being available to the CSE team and [ ] a faulty IEP." (Pls.' Mem. L., p. 11.)

c. Regular Education Teacher

The CSE must include "not less than 1 regular education teacher of [the] child (if the child is, or may be, participating in the regular education environment)". 20 U.S.C. § 1414(d)(1)(B)(ii). Here, the SRO found that although the CSE was improperly constituted, T.S. was not denied a FAPE because

her first grade teacher submitted a report in lieu of attending, and because another regular education teacher from the school attended the meeting. (SRO Decision, p. 19.)

The report submitted in lieu of Mr. Pregiato's attendance at the meeting assesses, over the course of one and one half pages, T.S.'s performance in reading, writing, math, and behavior in first grade. (Dist. Ex. 15.) The report was apparently prepared without the benefit of the myriad assessments and the social history discussed at the CSE meeting. Nevertheless, there is insufficient evidence on the record to conclude that Mr. Pregiato's absence resulted in the denial of a FAPE.

Plaintiffs argue that Mr. Pregiato's report either excludes or explains away T.S.'s frustration, crying, and behavioral problems. (Pls.' Mem. L., p. 8.) The IEP itself, however, addresses T.S.'s behavioral issues, PTSD, and ADHD. (Dist. Ex. 17.) In light of the fact that the IEP provides for psychological treatment and behavioral assessment, and takes into account T.S.'s tendency to rush through her work and her need for positive reinforcement, there is no evidence that having Mr. Pregiato opine that T.S. required any of those supports would have made any difference in the composition of the IEP. Mr. Pregiato's absence does not rise to the level of a procedural violation of IDEA.

d. FBA

Where a student's behavior impedes his or her learning or that of others, the CSE must consider behavioral interventions, supports, and strategies to address that behavior. 20 U.S.C. § 1414(d)(3)(B)(i). For such students, New York law requires an FBA, which is defined as "the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment." 8 N.Y.C.R.R. 200.1(r). The SRO concluded that "the student did not exhibit behavioral issues indicating that an FBA was required prior to the time of the July 21, 2008 CSE meeting." (SRO Decision, p. 21.) The SRO noted that the IEP stated that an FBA should be conducted in the future, and noted that this recommendation was the result of the mother's concerns that T.S.'s behavior was affecting her school performance. (Id.)

The absence of an FBA does not render an IEP procedurally inadequate, as long as the IEP itself considers behavioral strategies. See A.C. ex rel M.C. v. Bd. of Educ. of the Chappaqua Sch. Dist., 553 F.3d 165, 172 (2nd Cir. 2009) (finding an IEP that addressed behavior procedurally valid even in the absence of a FBA); J.A. v. East Rampano Cent. Sch. Dist., 603 F. Supp. 2d 684, 689 (S.D.N.Y. 2009) (rejecting a claim that the absence of a FBA rendered an IEP invalid and finding that IDEA requires only consideration of behavior interventions and

strategies). T.S.'s IEP noted that T.S. required positive reinforcement and verbal prompts (Dist. Ex. 17, p. 2), and directed that an FBA be completed during the coming school year. (Id., p. 4.) It also directed that her teacher receive psychological consultation to "facilitate behavior intervention." (Id.) T.S.'s IEP considered behavioral strategies and the absence of an FBA did not render the IEP procedurally inadequate.

2. Substantive Adequacy of the IEP

"[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted). School districts are not required to provide "every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199. Moreover, there is "a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when

assessing the IEP's substantive adequacy." Cerra, 427 F.3d at 195."

Plaintiffs urge this Court to conclude that the IEP was not substantively adequate because the CSE classified T.S. as "Other Health Impaired" when she met the definition for classification as a student with a speech or language impairment. (Pls.' Mem. L., p. 15.) Plaintiffs point to the testimony of T.S.'s teacher at the Stephen Gaynor School, who testified that T.S. belonged in a small class, and the report of Dr. Kenner, which concluded that T.S. required placement in a specialized school for students with language-based learning disabilities. (Pls.' Mem. L., p. 15-16.)

There is evidence on the record to support the SRO's conclusion that the IEP was substantively adequate. The District's experts did not agree with the conclusions and recommendations of the experts proffered by the parents, and there was evidence that T.S. progressed in her mainstream first-grade class in a less restrictive environment than that advocated by the parents. (SRO Decision, pp. 22-23.) Even the IHO concluded that T.S. made "significant progress" in her general education first grade class. (IHO Decision, p. 9.)

This Court is not permitted to choose "between the views of conflicting experts on a controversial issue of educational policy ... in direct contradiction of the opinions of state

administrative officers who had heard the same evidence." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003). This Court defers to the SRO's conclusion that the IEP was substantively adequate.

Because this Court agrees with the SRO that T.S.'s IEP was not procedurally or substantively inadequate, it need not address whether the Stephen Gaynor School was an appropriate placement or whether the equities favor tuition reimbursement. See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009).

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is directed to CLOSE the docket in this case.

SO ORDERED.

Dated: New York, New York
March 30, 2011

Deborah A. Batts
Deborah A. Batts
United States District Judge